IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 07-00258-01-CR-W-SOW |
| ROSA AMANDA RIVERA, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE**

Before the court is a motion to suppress evidence filed by defendant Rosa Amanda Rivera on the ground that police entered her home and searched it without a warrant and without her consent. I find that (1) defendant consented to entry by police into her home, (2) defendant admits that Social Security cards and other identification paperwork was sitting in plain view in the living room, (3) the credible evidence establishes that police did not search defendant's home other than conducting a sweep search, (4) nothing incriminating was observed during the sweep search, and (5) defendant provided police with her true name at the direction of her cousin. Therefore, defendant's motion to suppress should be denied.

*I. BACKGROUND*

On June 14, 2007, Immigration officers went to defendant's residence after receiving information that a Thomas Coyote-Franco was living there, and they had a warrant for Coyoto-Franco's

arrest. Defendant allowed them into the house and said she did not know Coyoto-Franco. Defendant identified herself as Sheila Bruno and provided documentation of her identity. Defendant was arrested on an outstanding warrant for Sheila Bruno for making a false police report. Before she was placed under arrest, officers saw a birth certificate showing the name Rosa Rivera. As she was being led to a police car, defendant admitted that her true name is Rosa Rivera.

On July 2, 2007, a complaint was filed charging defendant with one count of identification fraud, in violation of 18 U.S.C. § 1028(a)(7). On July 19, 2007, an indictment was returned charging defendant with the identification fraud count, and with one count of fraudulent use of a Social Security number, in violation of 42 U.S.C. § 408(a)(7)(B), and one count of falsely representing herself to be a United States citizen, in violation of 18 U.S.C. § 911.

Defendant filed a motion to suppress evidence on September 11, 2007 (document number 25). On September 27, 2007, the government filed a response in opposition to defendant's motion (document number 29).

On October 3, 2007, I held an evidentiary hearing on defendant's motion to suppress evidence. The government appeared by Assistant United States Attorney Richard Staples. The defendant was present, represented by Assistant Federal Public

2

Defender Laine Cardarella. The following witnesses testified:

1. Erik Teschner, deportation officer with Immigration and Customs Enforcement.

2. Neil Harmon, deportation officer with Immigration and Customs Enforcement.

3. Defendant Rosa Rivera.

In addition, the following exhibits were admitted:

P. Ex. 1  Copy of Missouri identification card and Social Security card in the name of Sheila Bruno

P. Ex. 2  Copy of Worlds of Fun, Oceans of Fun Ambassador Panda Express employee card in the name of Sheila Bruno

P. Ex. 3  Copy of fraudulent Permanent Resident Alien card bearing the name Juan Jose Gutierrez; copy of fraudulent Social Security card

P. Ex. 4  Copy of birth certificate naming Rosa Amanda Rivera as mother

P. Ex. 5  Guatemalan passport

P. Ex. 6  Consular identification card bearing the name Rosa Amanda Rivera

P. Ex. 7  Sworn statement given by defendant

## *II. EVIDENCE*

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. In June 2007, Deportation officers received a tip that Tomas Coyote-Franco, an immigration fugitive with an outstanding arrest warrant, was living at a residence on Cypress Avenue (Tr. at 4-5, 19-20). Deportation Officer Erik Teschner used the Accurint computer base which indicated that Coyote-Franco had

3

been receiving mail at that address (Tr. at 5, 20). Officer Teschner had no other information that illegal activity was going on at this address (Tr. at 20, 48).

2. On June 14, 2007, Officer Teschner went to 2028 Cypress Avenue[1] looking for Tomas Coyote-Franco (Tr. at 4-5). Officer Harmon with Immigration and Customs Enforcement and two Kansas City, Missouri, police officers went to the Cypress address with Officer Teschner (Tr. at 5, 27). Officer Teschner went to the front door with one police officer, and Officer Harmon went to the back of the house with the other police officer (Tr. at 5, 27-28, 41).

3. Officer Teschner approached the front door and knocked, and defendant answered (Tr. at 5, 70). He told defendant that he and the other officer were with Immigration Customs Enforcement and with the Kansas City, Missouri, Police Department, and that they were looking for Tomas Coyoto-Franco, a fugitive they believed may be residing at this residence and for whom they had an administrative warrant (Tr. at 5-6, 14-15, 74). Officer Teschner asked defendant if he could come inside and check the house (Tr. at 6, 70, 74). Defendant said, "yeah" and let the officers into the house (Tr. at 6, 15, 70, 73-74). Defendant and

---

[1]The address was referred to as 2028 and as 2020 during the hearing (Tr. at 4, 14, 20, 27, 43).

4

Officer Teschner were speaking in both English and Spanish[2] (Tr. at 6). There was no indication that defendant did not understand the conversation (Tr. at 26).

    4.    There were two children present with the defendant, a four-year-old girl and an infant (Tr. at 14, 18, 19, 28). Officer Teschner showed defendant a photograph of Tomas Coyoto-Franco, and she said he was not there, that she did not know him (Tr. at 6, 15, 20-21).

    5.    Teschner and the other officer quickly went through the house to make sure Mr. Coyote-Franco was not there (Tr. at 7, 19, 21). They did not go through any boxes or drawers or look in any places that were too small to hide a person (Tr. at 7, 70, 71, 76). No officer looked through defendant's purse (Tr. at 71, 77). Defendant stayed in the living room during the sweep search (Tr. at 19). Officer Teschner then radioed to Officer Harmon to let him know the house was cleared (Tr. at 7, 28, 42). Officer Harmon and the other Kansas City police officer went to the front of the house and came inside (Tr. at 7, 28). Officer Harmon saw defendant's daughter and in English said hello, asked her what her name was, and told her everything was going to be fine (Tr. at 46).

---

    [2]Officer Teschner testified that he spoke in English, but if she did not understand, he would try to say it in Spanish (Tr. at 16, 22). Most of the conversation was in English (Tr. at 16-17).

5

6. Because Officer Teschner did not know whether Coyote-Franco was living in the residence, he decided to talk to defendant (Tr. at 20, 49). He asked what her name was, and defendant stated that her name was Sheila Bruno (Tr. at 8, 20, 21, 29). She produced a Missouri identification card and a Social Security card (Tr. at 8, 21, 29, 71; P. Ex. 1). Defendant also handed Officer Teschner a Worlds of Fun employment card in the name of Sheila Bruno, which she had obtained from her purse (Tr. at 8, 21, 30, 71; P. Ex. 2). At no time while police were in defendant's house did anyone find a Guatemalan passport belonging to defendant (Tr. at 9-10, 32).

7. While the officers were talking to defendant, Officer Harmon observed in plain view a permanent resident alien card and numerous Social Security cards lying on a table in the living room next to where defendant was seated and next to where Officer Harmon was standing (Tr. at 30, 32, 78). He called his command center with the numbers and learned that the resident alien card and its matching Social Security card were counterfeit (Tr. at 30-31). Also lying with those documents was a birth certificate for defendant's four-year-old daughter Daniella (Tr. at 22, 33, 78). The birth certificate listed "Rosa Rivera" as the mother, which raised Officer Harmon's suspicions that defendant was not who she claimed to be (Tr. at 33). He also observed Guatemalan memorabilia and souvenirs in the home, and defendant had said

6

that she was from Puerto Rico (Tr. at 41). He asked defendant if she was Rosa Rivera, and defendant said that Rosa Rivera was a friend of hers and that her friend was the mother of the child (Tr. at 33). Officer Harmon spoke to defendant both in English and Spanish, but mostly English (Tr. at 44).

8. Officer Harmon then heard defendant speaking to Daniella in Spanish (Tr. at 46). He did not hear exactly what she was saying, but he heard Daniella start to cry and said, "No, I don't want to lie." (Tr. at 46-47). Officer Harmon asked Daniella in English whether defendant was her mother, and she said yes (Tr. at 45, 46).

9. Defendant was placed under arrest by the Kansas City, Missouri, police officers because she had an outstanding arrest warrant in the name of Sheila Bruno for making a false police report (Tr. at 10, 32, 35). The arrest was based solely on the outstanding warrant, not on anything found in the house (Tr. at 10, 35-36, 50). Even if Officer Harmon had not noticed the documents lying on the table, defendant would have been arrested by the Kansas City officers because of her outstanding warrant in the name of Sheila Bruno (Tr. at 50).

10. Because of the outstanding arrest warrant, defendant had to call someone to come pick up her kids because they were very young and there was no other adult present (Tr. at 72). No officer ever threatened to take defendant's kids away (Tr. at 72,

7

77).  A male individual came over and took custody of the kids (Tr. at 72).

11.  As defendant was walking down the steps toward the police car while in the custody of the police, she said, "Rosa Rivera", which is her real name (Tr. at 11, 24).  She had started to cry when she said what her real name was (Tr. at 11, 24).

12.  No one searched through any boxes in a bedroom or computer room of defendant's residence (Tr. at 51).  At no time did defendant ask the officers to leave or do anything to make them think they were not welcome in the residence (Tr. at 51).  At no time did any officer take Daniella out of the living room, and no officer questioned her other than asking her if defendant was her mom (Tr. at 18, 24, 75-76, 77-78).

13.  The day after her arrest, defendant was transferred to the custody of Immigration and Customs Enforcement (Tr. at 36).  Officer Hanson contacted Susan Gladney, a Legal Aid lawyer in the Kansas City area, and she spoke with defendant (Tr. at 36).  After speaking with this lawyer, defendant agreed to waive her rights and make a sworn statement (Tr. at 36).

14.  The next day, one of defendant's male friends delivered a Guatemalan passport to the Immigration and Customs Enforcement office (Tr. at 38-39).  He also brought a consulate card (Tr. at 40).

8

15. Defendant testified at the hearing as follows:

   a.  On June 15, 2007, police officers with Immigration came to defendant's home, knocked on the door, and asked if they could ask her some questions (Tr. at 54-55). She said yes, and she opened the door (Tr. at 55). They showed her a picture of someone she does not know (Tr. at 55).

   b.  The officers went into her house without permission and began searching (Tr. at 55). The officers were speaking in English, and defendant understood a little of what they were saying (Tr. at 55-56). At no time did they ask her in English whether they could look around her house (Tr. at 56). She did not open the door and invite them to come into the house (Tr. at 56).

   c.  The officers asked her for identification, and she gave them the identification and Social Security card of Sheila Bruno (Tr. at 56). They asked where she was from, and she said Puerto Rico (Tr. at 56). Officer Hanson said, "Sheila Bruno is not your real name." (Tr. at 56-57). They said, "You are not Puerto Rican." (Tr. at 57). They told her if she did not tell them who she was, they would arrest her and take her kids away (Tr. at 57). They looked in her purse and found her Worlds of Fun identification (Tr. at 57).

9

d.  The officers took Daniella to her room, but defendant was able to see them from the couch (Tr. at 57-58).  She heard what the officers were saying to Daniella (Tr. at 58).  Defendant saw the officers take a drawer out of defendant's bed and look at a birth certificate, then ask Daniella, "Is she your mom?  Where is she from?  What is your mom's name?  What is your name?" (Tr. at 58, 60).  She recognized the document as Daniella's birth certificate.

e.  Defendant kept standing up from the couch telling the officers not to question Daniella because she did not understand English, but they made her sit back down (Tr. at 63).  Defendant did not tell the girl to lie, she told her not to talk, not to say anything (Tr. at 63).

f.  There was an ID card on the table by a computer in the living room because her brother had brought it (Tr. at 63).  He asked her to help him find work where she works, and so he brought his ID and she helped him fill out the application so he could get a job (Tr. at 63-64).

g.  The officers wanted defendant to call her cousin so he could come over to get her kids (Tr. at 64). Defendant's cousin came to the house and he encouraged her to reveal her true identity (Tr. at 64-65).

10

h. Defendant has been in the United States illegally since May 2001 (Tr. at 66). Both of her children were born in the United States (Tr. at 66).

16. To the extent defendant's testimony is inconsistent with the findings of fact listed above, I find her testimony not credible for the following reasons:

a. If she only understood a little English, she could not have known that they never asked in English to come inside the house.

b. She testified that she did not open the door and invite them inside, but did not explain how they got into her house.

c. The officers already had a valid arrest warrant for Sheila Bruno, so it makes no sense that they would threaten her with arrest if she failed to say who she really was.

d. It is implausible that the officers would take Daniella to the correct room, open the correct drawer, open the correct box inside that drawer, and pick up a document which just happened to be a birth certificate bearing defendant's true name.

e. It is implausible that defendant would be able to tell what paper was taken from a drawer in a bedroom while she was sitting in the living room.

11

f. Defendant testified that before the officers took the birth certificate out of the drawer, they had threatened to take her kids away and asked her if she was Rosa Rivera (Tr. at 61, 62). However, there was nothing indicating defendant's true name except the birth certificate, so it makes no sense that the officers would ask her if her name was Rosa Rivera prior to finding the birth certificate.

g. Defendant testified that the police had paperwork bearing the name Rivera before they went into the bedroom, but when asked where they got the paperwork, she said they took it from a box in her bedroom (Tr. at 62).

h. Defendant was asked whether the officers used any "bad words" and she said they did (Tr. at 64). When asked to describe them, she said that they threatened her but did not give any specifics about what was said (Tr. at 64). In addition, this is inconsistent with defendant's testimony that she only speaks a little bit of English, but she was aware of "bad words" used by the officers.

i. Defendant's allegation that the officers threatened to take her kids away is inconsistent with her testimony that they wanted her to call her cousin so he could come to get her kids due to her outstanding arrest warrant.

j. Defendant testified that she had asked the officers not to talk to her daughter because she does not understand English; however, the officer asked Daniella in English if defendant was her mother, and she not only understood, she answered him in English.

### III. ENTRY INTO THE RESIDENCE

Police may enter a home without a warrant if they have the consent of someone with apparent authority to consent. In United States v. Varner, 481 F.3d 569, 572 (8th Cir. 2007), Varner agreed to an officer accompanying his girlfriend to the basement and thus consented to the officer's entry into the basement, where drug items were in plain view. In United States v. Esquivias, 416 F.3d 696, 703 (8th Cir. 2005), the court held that the defendant had consented to entry into the room which led to plain view of narcotics. In United States v. Brooks, 2 F.3d 838, 842 (8th Cir. 1993), the court held that, "Although the Fourth Amendment generally prohibits the warrantless entry of a person's home . . . the prohibition does not apply when voluntary consent has been obtained". In United States v. Turbyfill, 525 F.2d 57, 59 (8th Cir. 1975), the court held that officers were justified in seizing drugs in plain view after having obtained consent to enter the house.

Voluntary consent need not amount to a waiver. United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990). Consent

13

can be voluntary without being an "intentional relinquishment or abandonment of a known right or privilege." Schneckloth v. Bustamonte, 42 U.S. 218, 222 (1973). The proper test is whether the totality of the circumstances demonstrates that the consent was voluntary. Id. at 226. Consent is voluntary if it was "the product of an essentially free and unconstrained choice by its maker" rather than the product of duress or coercion, express or implied. Id. at 227.

Consent to enter a residence can also be implied. In United States v. Smith, 973 F.2d 1374, 1376 (8th Cir. 1992), the court found implied consent to enter when the defendant's wife stepped aside and motioned for officers to enter. In United States v. Turbyfill, 525 F.2d at 59, the court found implied consent when the defendant's wife opened the door and stepped back to let officers enter. In United States v. Curnett, 123 Fed. Appx. 733 (8th Cir. 2005), the court found implied consent to enter the home when the defendant pushed open the screen door for police and asked "What's the matter?". Cf. United States v. Poe, 462 F.3d 997 (8th Cir. 2006) (no implied consent to enter when the defendant opened the door to police only after police knocked and announced their presence for over ten minutes, leading defendant to conclude that he had no choice but to open the door).

In this case, the undisputed evidence is that two officers were at defendant's front door, they knocked, she answered, they identified themselves and stated their purpose for being there, they asked if they could come in, and defendant said, "yeah" and opened the door for them. Even defendant testified that when the officers knocked and asked if they could ask her some questions, she said "yes" and opened the door. This amount to an implied consent to enter her home.

Defendant argues that but for the illegal search of the drawer in her bedroom, police would not have learned her true identity and she would have been granted bond on the arrest for filing a false police report. However, the credible facts are that police did not search defendant's bedroom drawers and that the birth certificate bearing her true name was in plain view in the living room. Additionally, the evidence establishes that defendant's cousin was called to take the children because defendant was being arrested under the name of Sheila Bruno pursuant to an outstanding arrest warrant, and that defendant's cousin convinced her to tell police her true identity. Therefore, police learned of defendant's true identity based on her own statement which was made with the encouragement of her own cousin.

Furthermore, it is undisputed that there were other documents lying on a table in plain view in the living room.

15

Those documents consisted of multiple Social Security cards and a permanent resident alien card. Officer Hanson testified that seeing those documents aroused his suspicion that defendant may not be who she claimed to be. Because defendant had already provided her identification card and Social Security card to the police, the presence of additional similar documents would likely cause the officers to verify the legitimacy of the documents provided by defendant. At that time they would learn that defendant had presented false identification documents. All of this would be done without the police ever leaving the living room, without conducting a sweep search of the remainder of the house. Defendant's assertion that she would have been released on bond with no questions asked is speculative at best, and implausible at worst.

### *IV. CONCLUSION*

Based on the above-stated findings of fact and the law as discussed in section III, I make the following conclusions of law:

1. Officers were authorized to enter the residence because defendant consented to their entry.

2. Officers lawfully arrested defendant pursuant to an outstanding arrest warrant in her alias name.

3. Officers observed other Social Security cards and identification paperwork lying in plain view on a table in the

16

living room.  That documentation made Officer Hanson suspicious that defendant perhaps was not who she claimed to be.

    4.   Defendant provided police with her real name after having been encouraged to do so by her cousin.

Based on all of the above, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress evidence.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.


                                  /s/ *Robert E. Larsen*
                                ROBERT E. LARSEN
                                United States Magistrate Judge

Kansas City, Missouri
October 25, 2007

17

Case 4:07-cr-00258-FJG   Document 33   Filed 10/25/07   Page 17 of 17